FILED

MAY - 1 2003

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

CHRISTELL HUTCHERSON,

               Plaintiff,

     v.

BAYER CORPORATION, and DOES 1-20,
inclusive,

               Defendants.

_____/

No. C 01-1799 MHP

**MEMORANDUM AND ORDER**
**re Defendant's Motion for**
**Summary Judgment**

     Plaintiff Christell Hutcherson brought this action against her employer, Bayer Corporation ("Bayer"), alleging that her supervisors at Bayer failed to promote her, gave her negative performance evaluations, and subjected her to harassment because of her age, race and gender as well as in retaliation for her filing of complaints and lawsuits alleging discrimination.  Now before the court is defendant's motion for summary judgment.  Having considered the arguments of the parties, and for the reasons set forth below, the court rules as follows.

BACKGROUND

     Christell Hutchinson is a fifty-year-old African-American woman.  Hutcherson Dec. ¶ 2.  After receiving an associate of arts degree in chemical technology from Merritt College in 1973, Hutcherson began working as a chemical technician for Cutter Laboratories in Berkeley, California.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   Id. ¶ 3.  Cutter Laboratories was later acquired by Miles Biologicals, which was in turn purchased by

2   Bayer Corporation.[1]  Id.

3        Within three years of the start of her employment, Hutcherson was promoted to sub-

4   supervisor in the Plasma Processing Department, a position in which six employees reported directly

5   to her.  Id. ¶ 5.   She remained a supervisor in the Plasma Processing Department until 1997, when

6   she was promoted to shift supervisor.  Id. ¶ 8.

7        In 1993, after her application for promotion to shift supervisor had been rejected in favor of

8   that of an African American male with less experience and education, Hutcherson filed a

9   discrimination complaint with the Equal Employment Opportunity Commission ("EEOC") followed

10  by a discrimination suit under Title VII alleging sex discrimination.  Id. ¶¶ 6, 7; see also Hutcherson

11  v. Miles Biologicals, No. C 95-0468 MHP (N.D. Cal, filed Feb. 9, 1995).  On March 27, 1997, this

12  court entered summary judgment in the Title VII suit in favor of defendants.

13       Hutcherson unsuccessfully applied for another promotion in 1995.  Bayer chose Kevin

14  Phillips, a white male under forty years of age from a pool of six applicants for the position.

15  Hutcherson first filed a complaint with the EEOC and then filed a lawsuit in this court alleging

16  discrimination on the basis of race, sex and age.  See Hutcherson v. Miles Biologicals,

17  No. C 97-0433 MHP (N.D. Cal. 1997).  On January 5, 1998, this court entered summary judgment in

18  favor of defendants on all claims.  See Hutcherson v. Miles Biologicals, 1997 WL 154379 (N.D.

19  Cal., Mar. 21, 1997).

20       Plaintiff was promoted to shift supervisor in the plasma processing department in the spring

21  of 1997.  Hutcherson Dec. ¶ 8.  She remained in this position until she resigned from Bayer in 2002.

22  JUF ¶ 23.

23       Hutcherson continued with her education while working full-time at Bayer.  She received an

24  associate of arts degree in accounting from Merritt College in 1997.  Hutcherson Dec. ¶ 3.  She

25  obtained bachelor of science and masters degrees in business administration from the University of

26  Phoenix in 2000 and 2002, respectively.  Id.

27

28

2

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

I.    1999 WPS & Discrimination Complaint

When Hutcherson was first promoted to shift supervisor in 1997, she reported to the department manager, Wing Man Tam. Hutcherson Dec. ¶ 9; JUF ¶¶ 7, 9. In or about September 1998, she began reporting to a newly hired Area Supervisor, Andrew Hetherington, in addition to Tam. Hutcherson Dec. ¶ 11; Hetherington Dec. ¶ 1. At her first annual performance review, conducted in February 1999 for the 1998 year, Tam rated her performance as "meets expectations." JUF ¶ 17.

In 1999, several personnel changes occurred in the Plasma Processing Department. Robert Russey was promoted to Area Supervisor from his position as manufacturing Shift Supervisor in June of 1999. Russey Dec. ¶ 1. Andrew Hetherington was promoted to Department Manager in August of 1999.[2] Hetherington Dec. ¶ 1. Hutcherson remained a shift supervisor throughout this time, but in October moved to a different section of the Plasma Department. Hutcherson Dec. ¶ 9. Under the new arrangement, Hutcherson began reporting to Russey. JUF ¶ 9.

On October 28, 1999, Hetherington placed Hutcherson on a Work Plan for Success (WPS). Hutcherson Dec. ¶ 18 & Exh. 2; Hetherington Dec. ¶ 7. A WPS is a performance-based disciplinary action, under which failure to improve performance within a sixty-day probationary period can result in further disciplinary action, including termination. Hutcherson Dec. ¶ 18 & Exh. 2. Joyce Pearce, another African American woman over the age of forty and a shift supervisor in the same department, who had given deposition testimony supporting Hutcherson in her prior discrimination lawsuits, was the only other shift supervisor to be placed on a WPS in October 1999. Hutcherson Dec. ¶ 19. The WPS listed as problems that Hutcherson communicated with others in a short and unfriendly manner, that she often declined to address production problems on grounds that the issues were not her area of responsibility, that she had not been filling in Batch Production Records ("BPRs") properly or completely, that on one occasion she had not been present on the production floor as requested for a particular operation, and that she had not been communicating complaints to the Area Supervisor or Department Manager but to other departments. Id., Exh. 2. Hutcherson submitted a written rebuttal in which she contested the factual basis for the WPS. Id., Exh. 3.

3

1  Hutcherson completed the WPS satisfactorily on February 2, 2000, and was so notified by memo.
2  Hetherington Dec. ¶ 7 & Exh. F.

3        On November 19, 1999, Hutcherson filed an internal complaint with Bayer alleging that in
4  imposing the October 1999 WPS, Hetherington discriminated against her on the basis of race and
5  gender and retaliating for her previous discrimination complaints.  Hutcherson Dec., Exh. 4.  She
6  submitted the complaint in the form of a memo to Hetherington himself.  Id.  She alleged that white
7  male supervisors had behaved as she had without being placed on a WPS, and that the WPS was
8  based on subjective criteria such as her communication style.  Id.

9  II.    Hutcherson's Application for Promotion to Plasma Department Area Supervisor

10       In August 1999, Bayer posted an internal announcement for an Area Supervisor position in
11 the Plasma Department.  Area Supervisor Job Posting, Hutcherson Dec., Exh. 1 (hereinafter "Area
12 Supervisor Job Posting").  According to the posting, the Area Supervisor job required "knowledge
13 and training ordinarily acquired from the highest undergraduate level courses in Bio-Science,
14 Engineering, or Chemistry plus 8+ years Production and/or Engineering experience in the
15 Pharmaceutical/Biotechnology industry, or an equivalent combination of education and experience."
16 Id.  Hutcherson submitted an application for the position during the August posting period which
17 was accepted by Bayer's human resources department.  Hutcherson Dec. ¶ 14 & Area Supervisor Job
18 Posting.

19       As newly promoted Department Manager, Andrew Hetherington became responsible for
20 selecting the Area Supervisor. Hetherington Dec. ¶¶ 1, 3.  To conduct interviews, Hetherington
21 assembled a selection panel consisting of two Caucasian men (including Hetherington himself), two
22 Asian men, and two Caucasian women.  Id.  The interviews were conducted during January and
23 February of 2000.  Id.  There were five candidates interviewed, of which three were white males and
24 two were black females.  Chart of Ranking Information for January/February 2000 Area Supervisor
25 Candidates, Schreibstein Letter dated Mar. 3, 2003 ("Candidate Ranking Chart").  The black female
26 candidates were also significantly older than the white male candidates.[3]  Id.  The panel rated the
27 candidates on a scale of one to five ("poor" to "excellent") in each of four areas of "core
28 competency" based on responses to a standardized set of questions.[4]  Hetherington Dec. ¶ 4.

4

UNITED STATES DISTRICT COURT
For the Northern District of California

The panel selected Adam Pinkert, a twenty-eight year-old white male, over Hutcherson and the other candidates. JUF ¶ 12; Hutcherson Dec. ¶ 17; Lofton Supp. Dec., Exh.32, Pinkert Dep. at 15:9-11. Pinkert graduated from the University of California, Berkeley in 1994 with a bachelor of science degree in chemistry and anthropology, and directly went to work for Bayer. Pinkert Résumé, Lofton Dec., Exh. 19. At the time he interviewed for the Area Supervisor position, Pinkert had accrued five years of production experience. Id.; Pinkert Dep. at 34:1-6, Lofton Dec., Exh. 32 ("Pinkert Dep.").

Hutcherson received low marks of two to three from each panel member in each of the competency areas. See Hetherington Dec. ¶ 5 & Exh. C & D; Liljefelt Dec., Exh. A; Helgeson Dec., Exh. A; Dwvedi Dec., Exh. A; Lee Dec., Exh. A (collectively "Interview Panel Notes").[5] Interviewers also indicated that Hutcherson did not meet some of the specific knowledge requirements of the job.[6] Id. The panel on average rated Hutcherson fourth out of the five candidates. Candidate Ranking Chart. Pinkert received the highest marks of any candidate. JUF ¶ 12; Hetherington Dec. ¶ 5. Panel members gave Pinkert marks of four to five in each of the competency areas and found that he fulfilled all specific knowledge requirements for the position. Hetherington Dec. ¶ 5; Interview Panel Notes. Mayers, a white male aged thirty-two, was the panel's second choice, while the remaining three candidates (Ray, Hutcherson, and Pearce) were each ranked significantly lower than the two leading candidates.[7] Candidate Ranking Chart.

II.    Other Promotion Opportunities

Over the two years following her unsuccessful application for Area Supervisor, Hutcherson applied for five different internally posted jobs, seeking both promotion and a position outside her department, in which she found herself increasingly unhappy.

In January 2000, Hutcherson bid on an internal posting for a supervisor distribution and warehouse position. The hiring manager, Clif Bolden (an African American male), considered Hutcherson qualified for the position, but selected another candidate, Stanley Chu, for the position. Bolden Dec. ¶¶ 1, 2. As justification for his decision, Bolden states that Chu's greater experience with computer programs was valued in light of an upcoming change in automation system in the

5

UNITED STATES DISTRICT COURT
For the Northern District of California

1    department, and that Chu's most recent position in manufacturing gave him a greater familiarity with

2    the practices and procedures of the warehouse department.  Id.

3        In March 2000, Hutcherson bid on an internal posting for a Senior Regulatory Affairs

4    Specialist.  Hutcherson was not invited to interview for the position.  Lambert Hiring Notes, Lambert

5    Dec., Exh. A.  The hiring manager, Raf Lambert, selected Leslie Twomey from among eighteen

6    internal candidates for the position.  Lambert Dec. ¶ 2.  Lambert describes Twomey's credentials as

7    "far superior" to Hutcherson's.  In particular, Lambert cites as grounds for his decision Twomey's

8    more relevant education (a college degree in biology rather than in business administration), her

9    experience within Bayer with validation (an important and complex subset of regulatory

10   documentation), and Twomey's experience in documentation at another company, Genentech, Inc.

11   Id. ¶ 3.

12       In November 2001, Hutcherson bid on an internally posted Financial Analyst II position.

13   Connie Ross, the staffing contractor in charge of the filling the position, determined that Hutcherson

14   did not possess the necessary accounting background.  Ross Dec. ¶ 4.  Although Hutcherson later

15   told Ross that she had recently received an M.B.A., she did so only after the position had been filled

16   by Jonathan Luse, a temporary worker who had been filling the position for the previous eighteen

17   months.  Id. ¶ 5.  Luse holds an M.B.A., had ten years of finance-based work experience, and had

18   previously worked at Bayer for more than seven years.  Id. ¶ 5 & Exh. E.

19       Also in November 2001, Hutcherson bid on an internally posted position of Regulatory

20   Affairs Administrator, a position which called for "knowledge ordinarily acquired from the highest

21   undergraduate courses in physical and/or life sciences with 7+ years of technical experience in the

22   pharmaceutical industry."  Rauschen Dec. ¶¶ 2–3 & Exh. A.  Of six candidates considered,

23   Hutcherson was one of three whose knowledge of "facility or utility related issues" was deemed

24   "minimal" by the hiring manager, Frank Rauschen.  Rauschen Dec. ¶ 3 & Exh. C.  She showed little

25   interest in the more independent and less interactive style of the regulatory work environment.  Id. ¶

26   3 & Exh. C.  Rauschen chose Megan Ward, another internal candidate, to fill the position because

27   her prior position at Bayer had better technical expertise and familiarity with a particular building

28   which was slated for heavy regulatory support in the upcoming two year period.  Id. ¶ 4.  Ward

UNITED STATES DISTRICT COURT
For the Northern District of California

1  obtained a bachelor of science in biological sciences from the University of California, Davis in 1992

2  and had been worked in the biotech field since her graduation.

3        In January 2002, Hutcherson bid on an internally posted position of Manager Manufacturing

4  Administration.  Ross Dec. ¶ 2.  Connie Ross, the staffing specialist who received Hutcherson's

5  application, declined to forward it to the appropriate hiring manager because of Hutcherson's

6  disciplinary history.  Under Bayer's guidelines for internal promotion, only Bayer employees who

7  have been in their current job for a minium of twelve months and have a performance rating of

8  "meets expectations" or better are eligible for promotion without permission from their human

9  resources consultant.  Ross Dec. ¶ 2 & Exh. B.  As a basis for her decision not to allow Hutcherson's

10 application to move forward, Ross cites Hutcherson's 2001 performance evaluation, in which she

11 received an overall rating of "needs improvement."  Ross Dec. ¶ 2 & Exh. C.

12 III.    Disciplinary Actions and Working Conditions

13       The WPS imposed on Hutcherson in the fall of 1999 marked the beginning of a steady stream

14 of negative performance evaluations, disciplinary actions, and changes in her working conditions that

15 form the factual basis for Hutcherson's harassment claim.

16       A.    Ochoco Complaint

17       On November 4, 1999, Michael Ochoco, an employee who worked under Hutcherson, filed a

18 complaint against her alleging that she had told a group of his co-workers that he would be

19 suspended for poor work attendance, out of his presence and before he had been informed.  Vierra

20 Dec. ¶ 4 & Exh. B.  Bayer Human Resources determined that gossiping about the potential

21 disciplinary action against Ochoco with his co-workers was inappropriate conduct for a supervisor.[8]

22 Id. ¶ 5.  Bayer responded by interviewing witnesses and addressing the complaint with Hutcherson in

23 her 1999 year end performance evaluation.  Id. ¶¶ 4, 6 & Exh. D.  Bayer counseled Hutcherson with

24 respect to the incident as part of her 1999 year-end performance evaluation.  Id. ¶ 6.

25       B.    Access to Computers and Adequate Work Space

26       In the latter half of 2000, Bayer undertook a company-wide initiative to ensure that

27 production supervisors were physically located near production staff and the production process.

28 Hetherington Dec. ¶ 8.  The primary workstation for Hutcherson's section within the Plasma

7

1    Processing Department was moved to Room 125, a room directly adjacent to the production area,

2    and all three shift supervisors were asked to use this room as their primary work area.  Id.  Shift

3    supervisors were also free to use computers in other rooms on the production floor, including Rooms

4    109 and 122.  Id.

5            Apparently as part of this initiative, Hutcherson's personal computer was taken away in June

6    2000, and she was told to use the computer in Room 125, which she refers to as a chemical storage

7    area.[9]  Hutcherson Dec. ¶¶ 30, 31.  To use a fax or copy machine or to work on a computer connected

8    to Bayer's mainframe, Hutcherson needed to exit the production area and go upstairs to offices on

9    the second floor.  Id. ¶ 32.  She made such trips more than five times per day.  Id.  Because the

10   production floor (including room 125) is a clean area, Hutcherson would be required to remove her

11   clean clothing upon exiting the floor and don new clean clothing upon returning.  Id. ¶ 32 & Exh. 8.

12   She complained that she developed knee problems as a result of walking up stairs and sitting on a

13   rolling chair on the inclined floor of the chemical storage area. Id. ¶ 31, 32. Although she was told

14   she could use the computers on the desks of other employees, those employees retained the right of

15   first use. Id. ¶ 30.

16           Hutcherson claims that other shift supervisors did not use the computer in Room 125 but

17   used computers upstairs.[10]  Hutcherson Dec. ¶ 33.  The two other shift supervisors in Hutcherson's

18   section state that after being informed of the initiative, they spent most of their shifts on the

19   production floor and used either their own laptops or the computers in Room 109, 122 or 125.

20   Hendrickson Dec. ¶ 2; Phillips Dec. ¶ 4.  Bayer also points out that (1) under the policy, all shift

21   supervisors were free to use upstairs computers when they were not being used by other employees,

22   Hutcherson Dec. ¶ 30; (2) the computers upstairs were usually occupied during the day shift when

23   more personnel were at work, but were available for the shift supervisors on the swing and evening

24   shifts, Schreibstein Dec., Exh. C, Hutcherson Dep. at 172:11-173:4; and (3) Hutcherson had

25   specifically requested that she be assigned to the day shift rather than swing or evening shift, id. at

26   173:5-7.

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

8

UNITED STATES DISTRICT COURT
For the Northern District of California

C.    Attendance Issues

Beginning in 2000, Hutcherson's use of sick and vacation time became an issue of contention between her and her supervisors.  Disputes arose over Hutcherson's overall absence rate as well as the procedures used to request absences and cover her shift in her absence.

On October 30, 2000, Hutcherson received a memorandum from Russey counseling her for absenteeism of 12.7% for the third quarter of 2000, well over Bayer's allowed rate of 5%.  Russey Dec., Exh. D.  On April 18, 2002, Pinkert issued memos counseling Hutcherson for exceeding Bayer's absentee guidelines for the fourth quarter of 2001 and the first quarter of 2002.  Pinkert Dec. ¶ 3 & Exh. A.

In March of 2002, Hutcherson discussed taking some vacation time in the upcoming weeks.  Hutcherson Dec. ¶ 40; Pinkert Dec. ¶ 2.  Hutcherson and Pinkert disagree as to whether Pinkert approved all the vacation time or requested that Hutcherson speak with him further about taking off the week of March 18.  Hutcherson took the week of March 18 as vacation, but Pinkert called Hutcherson in the middle of her time off to tell her that he had not approved the vacation, that she needed to report to work, and that she would not be paid for the unapproved time she took.  Hutcherson Dec. ¶ 40; Pinkert Dec. ¶ 2.  Hutcherson filed a complaint with human resources, which determined that Hutcherson's time would be treated as excused and she would be paid for the time.  Pinkert Dec. ¶ 2.

In June 2002, Ron Hein denied Hutcherson time off that she had requested to undergo periodontal surgery.  Hutcherson Dec. ¶ 41.  Hutcherson requested the vacation at a time when Bayer's production floor was to be shut down for repairs.  Id.  Hutcherson was also on a disciplinary plan at the time.  Id.  Hein justified his decision on the grounds that he could not properly monitor Hutcherson's progress on the plan if she took time off.  Id.

D.    Negative Performance Evaluations

Russey prepared Hutcherson's 1999 year end performance evaluation in February 2000.  He based his evaluation partly on input from others who had worked with Hutcherson throughout the year and partly on his own observations.  Russey Dec. ¶ 2.  Russey gave Hutcherson an overall rating

9

UNITED STATES DISTRICT COURT
For the Northern District of California

1  of "Below Expectations."  1999 Performance Evaluation, Russey Dec., Exh. A ("1999 Performance

2  Evaluation").

3      Russey arrived at the overall rating of "Below Expectations" by following a detailed

4  evaluation form.  Russey Dec., Exh. A, Performance Evaluation dated Jan. 28, 2000 ("1999

5  Performance Evaluation").  In one section of the form entitled "Performance Objectives," Russey

6  listed Hutcherson's key responsibilities in the production process, such as "[r]educe 1999 OSHA

7  recordable incident rate," "[m]anufacturing," "Alpha1 process validation," and "attendance."  Id.

8  Hutcherson received a "meets expectations" rating in all but one of these areas.  For most ratings,

9  Russey explained the rating by citing a quantifiable measure of performance such as Hutcherson's

10 accident rate, production figures, or absentee rate.  Id.  Another section entitled "Key Divisional

11 Competencies" set forth a variety of employee behaviors, such as "focus on goals," "focus on

12 customer," "sound judgment," and "collaborates and communicates."  Id.  The form instructs

13 supervisors to compare employee behavior to descriptions of target behavior set forth in other Bayer

14 materials.  Id.  Russey rated Hutcherson "needs development" for six of the nine categories in this

15 section, explaining his ratings with general comments about Hutcherson's conduct and

16 communication style.

17     In August 2000, Hutcherson received a mid-year review from Russey in which he rated her

18 "meets expectations."  Hutcherson Dec. ¶ 28.  In her annual performance review conducted in

19 January 2001, Russey gave her an overall rating of "below expectations."  Id.; Russey Dec. ¶ 2 &

20 Exh. C.  Out of seven key responsibilities, Russey rated Hutcherson "Needs Improvement" in five

21 areas.  Russey cited specific performance problems that resulted in each of these ratings: failure to

22 turn in routine safety audits and the occurrence of a major safety incident contributed to her low

23 Safety rating; absenteeism above the department guideline resulted in a poor Attendance rating;

24 process delays that resulted in falling short of production goals reduced her Manufacturing rating;

25 BPR turnaround much slower than required lowered her Quality rating; and Hutcherson's failure to

26 spend the required four hours per day on the production floor led to a low Projects rating.  Id.

27 Russey rated Hutcherson below target expectations in only two of nine "Key Divisional

28 Competencies."  Id.  No one had spoken with Hutcherson about her performance between August

10

UNITED STATES DISTRICT COURT
For the Northern District of California

1    2000 and January 2001, Hutcherson Dec. ¶ 28, although she received a memorandum from Russey

2    counseling her for absenteeism well over Bayer's allowed rate for the third quarter of 2000, Russey

3    Dec., Exh. D.

4            On April 23, 2001, Russey placed Hutcherson on another WPS based on performance issues

5    and communications issues. Hutcherson Dec. ¶ 29. Over a year later, on April 30, 2002, Ron Hein,

6    who had succeeded Hetherington as Department Manager, placed Hutcherson on a Work

7    Improvement Plan ("WIP"). Hutcherson Dec. ¶ 35; Hein Dec. ¶ 2 & Exh., 2002 WIP. A WIP is a

8    more serious disciplinary action than a WPS and may be the last step before termination.

9    Hutcherson Dec. ¶ 35; 2002 WIP. On July 16, 2002, Hein issued a memorandum disciplining

10   Hutcherson for an excessive absenteeism rate for June 2002, but withdrew the action on July 25,

11   after Hutcherson submitted valid doctor's reports for those absences. Hein Dec. Exhs.

12   Memorandum dated July 16, 2002, Memorandum dated July 25, 2002. On July 17, 2002, Hein

13   issued a memorandum disciplining Hutcherson for failing to comply with FDA documentation

14   requirements. Hein Dec. ¶ 5. Hutcherson's failures occurred during January 2002 and were

15   uncovered during an internal audit which uncovered violations by approximately twenty employees,

16   all of whom were disciplined. Id. ¶ 5 & Exh., Memorandum dated July 17, 2002.

17           Hutcherson resigned from her position at Bayer on July 29, 2002. JUF ¶ 23.

18

19   LEGAL STANDARD

20   I.    Summary Judgment

21           Summary judgment is proper when the pleadings, discovery and affidavits show that there is

22   "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

23   of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case.

24   See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is

25   genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving

26   party. Id. The moving party for summary judgment bears the burden of identifying those portions of

27   the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material

28   fact. See Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). On an issue for which the opposing

UNITED STATES DISTRICT COURT
For the Northern District of California

1  party will have the burden of proof at trial, the moving party need only point out "that there is an

2  absence of evidence to support the nonmoving party's case." Id.

3      Once the moving party meets its initial burden, the nonmoving party must go beyond the

4  pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

5  genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving

6  party's allegations. Id.; see also Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th

7  Cir. 1994). Nor is it sufficient for the opposing party simply to raise issues as to the credibility of the

8  moving party's evidence. See National Union Fire Ins. Co. v. Argonaut Ins. Co., 701 F.2d 95, 97

9  (9th Cir. 1983). If the nonmoving party fails to show that there is a genuine issue for trial, "the

10  moving party is entitled to judgment as a matter of law." Celotex, 477 U.S. at 323.

11      On motion for summary judgment, the court does not make credibility determinations, for

12  "the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions,

13  not those of a judge." Liberty Lobby, 477 U.S. at 249. Inferences to be drawn from the facts must

14  be viewed in the light most favorable to the party opposing the motion. See Masson v. New Yorker

15  Magazine, 501 U.S. 496, 520 (1991).

16

17  DISCUSSION

18      Hutcherson alleges that various supervisors at Bayer discriminated against her on the basis of

19  her age, gender, and race, and retaliated against her for previous complaints of discrimination she

20  filed, in violation of the California Fair Employment and Housing Act ("FEHA"). Because FEHA is

21  similar in language and purpose to title VII of the Civil Rights Act of 1964 and the Age

22  Discrimination in Employment Act, California courts look to federal cases interpreting those statutes

23  for guidance in interpreting the statute. Reno v. Baird, 18 Cal. 4th 640, 647–48 (1998). In

24  particular, California courts have adopted the burden-shifting mechanism used in federal

25  discrimination and retaliation cases in analyzing claims under FEHA. Guz v. Bechtel Nat, Inc., 24

26  Cal. 4th 317, 354 (2000) (discrimination); Miller v. Fairchild Indus., Inc., 885 F.2d 498, 504 n.4 (9th

27  Cir. 1989) (retaliation), cert. denied, 494 U.S. 1056 (1990).

28

UNITED STATES DISTRICT COURT
For the Northern District of California

Under this mechanism, a plaintiff must first present a *prima facie* case of discrimination or retaliation. To make out a *prima facie* case of discrimination, a plaintiff must show that she is a member of a protected class, she was qualified for a position sought or was performing competently in the position held, she suffered an adverse employment action, and some circumstance suggests discriminatory motive. Guz, 24 Cal. 4th at 355.

To establish a *prima facie* case of retaliation, a plaintiff must show that she engaged in protected activity, that her employer subjected her to adverse employment action, and that there was a causal link between the protected activity and the adverse employment action. Akers v. County of San Diego, 95 Cal. App. 4th 1441, 1453 (4th Dist. 2002). Informal complaints and protests against discrimination constitute a protected activity which can form the basis for a retaliation claim. Passantino v. Johnson & Johnson Consumer Products, Inc., 212 F.3d 493, 506 (9th Cir. 2000). The retaliatory motive may be proved by showing that plaintiff "engaged in protected activities, that his employer was aware of the protected activities, and that the adverse action followed within a relatively short time thereafter." Morgan v. Regents of Univ. of Cal., 88 Cal. App. 4th 52, 69 (1st Dist. 2000) (quoting Jones v. Lyng, 669 F. Supp. 1108, 1121 (D.D.C. 1986)). The causal link may be established by an inference derived from circumstantial evidence, "such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision." Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987); Morgan, 88 Cal. App. 4th at 69.

After the plaintiff offers evidence sufficient to establish a *prima facie* case, the burden shifts to the employer to articulate legitimate reasons for its employment decision. Once the employer carries this burden, the plaintiff must demonstrate that the employer's proffered reasons are a pretext for impermissible discrimination or retaliation. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252–53 (1981); accord Nidds v. Schindler Elevator Corp., 113 F.3d 912, 916 (9th Cir. 1996) (discrimination under FEHA); Miller v. Fairchild Indus., Inc., 885 F.2d at 504 n.4 (retaliation under FEHA). In proving pretext, a plaintiff must offer additional evidence beyond the minimum sufficient to establish her *prima facie* case in order to establish a triable issue of fact. Wallis v. J.R. Simplot Co., 26 F.3d 885, 889–90 (9th Cir. 1994). While a plaintiff may establish a genuine issue of

1 fact with "very little" direct evidence of discriminatory motive, a plaintiff relying exclusively on

2 circumstantial evidence must produce "specific, substantial evidence of pretext." Godwin v. Hunt

3 Wesson, Inc., 150 F.3d 1217, 1220–21 (9th Cir. 1998).

4      Although the burden of production shifts between plaintiff and defendant, the ultimate

5 burden of persuasion remains at all times with the plaintiff. Burdine, 450 U.S. at 253. "[A]n

6 employer is entitled to summary judgment if, considering the employer's innocent explanation for its

7 actions, the evidence as a whole is insufficient to permit a rational inference that the employer's

8 actual motive was discriminatory." Guz, 24 Cal. 4th at 361. Proof of discriminatory intent may be

9 direct, circumstantial or inferred from statistical evidence, and all evidence that the plaintiff presents

10 can contribute to the inference in a cumulative manner. Stender v. Lucky Stores, 803 F. Supp. 259,

11 319 (N.D. Cal.1992). Under California law, proof that the employer's proffered explanation is false

12 may assist a plaintiff's case for discrimination, but such evidence alone does not necessarily

13 constitute a sufficient showing to survive a summary judgement motion. Guz, 24 Cal. 4th at 360–61.

14 I.    1999 Failure to Promote Hutcherson to Area Supervisor

15      In its motion for summary judgment, Bayer does not contest that Hutcherson has adduced

16 evidence to satisfy a *prima facie* showing of retaliation or discrimination in her unsuccessful

17 application for the Area Supervisor position in 1999.[11]  Instead, Bayer proffers a variety of business

18 reasons for hiring Pinkert and maintains that Hutcherson has not offered sufficient evidence to find

19 these reasons pretextual.

20      As evidence of legitimate business reasons for hiring Pinkert, Bayer points primarily to the

21 declarations and evaluations of the selection panel, which included both women and Asian-

22 Americans. The panel determined that Hutcherson lacked certain specialized areas of knowledge

23 required for the position, such as good technical writing skills, an understanding of "CSRs," or

24 "validation protocols." See Area Supervisor Interview Panel Notes. The panel also found that

25 Pinkert possessed these skills. Id. Each of the interview panelists also rated Hutcherson

26 significantly lower than Pinkert in each of four core competency areas. Id. This showing satisfies

27 Bayer's burden of producing evidence of legitimate business reasons for hiring Pinkert.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

14

UNITED STATES DISTRICT COURT
For the Northern District of California

A.    Discrimination

Hutcherson presents five arguments that Bayer's proffered reasons for hiring Pinkert are pretext for discrimination.  First, Hutcherson argues that Pinkert was not actually qualified for the position because he had only five years of production experience while the Area Supervisor job posting called for eight or more years of experience.  Hutcherson Dec., Exh. 1, Area Supervisor Job Posting; Pinkert Dep. at 34:1-6.  In response, Bayer points out that the job posting actually called for high level undergraduate course work in the sciences and eight years of experience, or an equivalent combination of education or experience.  Hutcherson Dec., Exh. 1, Area Supervisor Job Posting.  Pinkert held only an undergraduate science degree—the minimum required by the posting.  Bayer gives no indication that Pinkert possessed education above the requirements that would compensate for the three years of production experience he lacked.  Bayer also notes that the selection process involves two stages—human resources first screens applicants for minimum qualifications, then forwards materials for qualified applicants to the manager in charge of conducting interviews and making the hiring decision.  Schreibstein Dec., Exh. D, Hetherington Dep. at 69:7-23.  The fact that candidates had been screened by human resources does not mean the panel should not have noticed Pinkert's relative inexperience.  While such a deviation might provide some evidence of discrimination, it alone would not alone support a jury finding of discrimination in the face of Bayer's articulated reasons for hiring Pinkert.

Second, Hutcherson contends that Pinkert was personal friends with panel members.  An examination of the evidence submitted proves this suggestion entirely unfounded.  For example, Pinkert testified in his deposition that as part of his duties in the position held prior to Area Supervisor, he had to go to panel member Helgeson approximately twice a week to get approval for documents.  Pinkert Dep. at 23:18–25:4.  He testified that this document approval was the extent of his contact with Helgeson, that he had contact with Helgeson only at Bayer, and that he considered him an acquaintance not a friend.  Id.  Given this testimony, Hutcherson's characterization of Pinkert's relationship with panel member Helgeson as one of "friends who met twice weekly" constitutes a blatant misrepresentation of the factual record.  Pinkert testified in his deposition that

15

1    he did not become social friends with any panel members until several years after he was promoted

2    to Area Supervisor. Id. at 21:22–25:25.

3         Hetherington did have a professional relationship with Pinkert prior to the Area Supervisor

4    interviews, in which Hetherington had spoken highly of Pinkert's capabilities. In August 1999,

5    Hetherington e-mailed human resources specialist Sherri Vierra to request that Pinkert be upgraded

6    from grade-06 to grade-08. Lofton Dec., Exh. 35, Hetherington E-mail dated Aug. 2, 1999.

7    Hetherington's e-mail justifying the upgrade based on Pinkert's outstanding performance answered

8    an e-mail from Vierra stating that Pinkert did not satisfy the ordinary experience requirement for a

9    grade-08 employee and requesting justification in order to comply. Id. Hetherington responded by

10   stating that Pinkert had taken a lead role among other grade-08 employees with respect to a variety of

11   tasks and had represented the Plasma Department "admirably" in various interdepartmental projects.

12   Id. Without evidence that such merit-based advancement violates Bayer company policies or was

13   applied in a discriminatory fashion, the exchange between Hetherington and Vierra suggests no illicit

14   departure from Bayer procedures, much less a discriminatory motive on the part of Hetherington.

15        Third, Hutcherson maintains that the use of panel interviews departed from ordinary

16   procedure at Bayer and therefore evinces a discriminatory motive.[12] Hutcherson provides no factual

17   basis for this claim other than Pinkert's statement that he had not been interviewed by a panel before

18   the Area Supervisor interviews. Pinkert Dep. at 40:1-6. This evidence proves little about Bayer's

19   interview practices. Far more relevant evidence on the issue is the declaration by human resources

20   specialist Sherri Vierra, who states that panel interviewing "has been used in promotional and hiring

21   decisions for many years and at least since 1998." Vierra Dec. ¶ 3. There is no basis for

22   Hutcherson's conclusion that Bayer deviated from interview practices in the Area Supervisor hiring.

23        Fourth, Hutcherson points to the promotion of Robert Russey, a thirty-five year-old white

24   male, to Area Supervisor in 1999 as evidence of a pattern of discrimination at Bayer. Hutcherson

25   claims Russey was unqualified for the position because he had only a high school diploma and some

26   college level courses in criminal justice and fire science, Russey Dep. at 10:14-11:23, Lofton Dec.,

27   Exh. 29, while the posted job qualifications called for advanced undergraduate science course

28   work.[13] Hutcherson does not, however, offer any evidence on the identity of other candidates for this

16

UNITED STATES DISTRICT COURT
For the Northern District of California

1    position, making it difficult to conclude that Russey's promotion was the result of discrimination.

2    Hutcherson also fails to offer any evidence on who made the decision to promote Russey, nor does

3    any evidence suggest that Hetherington would have participated in any way in the decision to

4    promote Russey.

5        Finally, Hutcherson offers accounts of her other failed applications for promotion as evidence

6    of a pattern discrimination at Bayer.[14]  Even if Hutcherson could show discrimination on the part of

7    the hiring managers in charge of filling either of these positions, neither of those managers

8    participated in any way in the hiring for the Area Supervisor position.  It is therefore far from clear

9    that evidence of discrimination by one hiring manager would reflect on the decision of the Area

10   Supervisor panel.  But Hutcherson fails to provide any evidence of discrimination in other hiring

11   decisions.  In her opposition, Hutcherson makes passing reference only to her applications for the

12   positions of Regulatory Affairs Administrator and Supervisor Distribution and Warehouse, stating

13   that at some unspecified time before or during each interview process, either the hiring manager or

14   the human resources representative told her that she would be hired for the job, but that subsequently

15   she was not chosen for either position.  Hutcherson Dec. ¶ 34.  While under some circumstances, a

16   sudden withdrawal of a promise of a job might provide evidence of discriminatory or retaliatory

17   motive, neither of the scenarios Hutcherson sets forth suggest discrimination.  Hutcherson first states

18   that human resources specialist Connie Hart told her that she "had the job" of Regulatory Affairs

19   Administrator then "reversed her position" less than an hour later.  Id. ¶ 34.  Hutcherson does not

20   state at what point in the interview process this exchange took place or anything about the context of

21   Hart's comments.  Without more, Hart's comment does not constitute evidence of discriminatory

22   motive on the part of the actual decision-maker, Frank Rauschen.  Hutcherson also states that Clif

23   Bolden told her that she "was hired" for the position of Supervisor Distribution and Warehouse,

24   pending confirmation with his manager, a white male.  Id.  She states she never heard from him

25   about the position again.  Id.  Nothing in Hutcherson's rather general description of the exchange

26   suggests either discrimination or retaliation.  Hutcherson simply does not address Bolden's

27   declaration that the candidate hired, Stanley Chu, had computer experience which would be

28

17

UNITED STATES DISTRICT COURT
For the Northern District of California

1   particularly valuable in the position and a greater familiarity with the practices and procedures of the

2   warehouse department due to his previous position within Bayer.  Bolden Dec. ¶¶ 1, 2.

3          The evidence offered on the promotion of Russey to Area Supervisor, the use of panel

4   interviews, Hutcherson's rejection for other promotions, or the relationship between Pinkert and

5   panel members gives no reason to doubt Bayer's proffered reasons for the hiring decision.  The only

6   facts which Hutcherson culls from the record that might suggest any impropriety in the hiring

7   process are that (1) Pinkert possessed less experience than called for by the requirements listed in the

8   Area Supervisor job posting, and (2) Hetherington had previously recommended a raise for Pinkert

9   based on his outstanding job performance.  These facts, however, do not undermine Bayer's

10  articulated reasons for hiring Pinkert, namely the panel's determination that Pinkert possessed

11  specific technical skills sought for the area supervisor position—skills which they determined

12  Hutcherson did not have—or the substantially higher ratings given to him by the panel in all core

13  competency areas.  Nor does the fact that Hetherington had previously requested that human

14  resources increase Pinkert's pay constitute evidence of Hetherington's discrimination absent an

15  indication whether such pay increases were allowed under company rules, and if so, to whom

16  Hetherington gave them.  In making the decision to hire Pinkert, Hetherington followed the

17  unanimous recommendation of a diverse selection panel.  The panel's endorsement further

18  undermines Hutcherson's claim that discriminatory motives on the part of Hetherington himself lead

19  to the Pinkert's selection.

20         The absence of any articulable reason to suspect discrimination is highlighted in

21  Hutcherson's own deposition testimony.  When asked why she suspected that various employment

22  actions raised in discovery were the result of discrimination at Bayer, Hutcherson repeatedly cited a

23  difference in race, gender or age between herself and an individual promoted (or given other

24  benefits) as the sole reason to think discrimination had occurred.  See Hutcherson Dep. at

25  17:11–20:24, 44:25–47:20, 52:12–56:14, 66:19–71:8, 85:15–91:10, 274:6–275:14.  A difference in

26  membership in a protected class alone is clearly insufficient to support a finding of discrimination

27  under FEHA.

28

1    The evidence offered by Hutcherson on her application for promotion to Area Supervisor is

2  "insufficient to permit a rational inference that the employer's actual motive was discriminatory."

3  Guz, 24 Cal. 4th at 361.  The court further finds that Hutcherson has failed to carry her burden of

4  producing either direct evidence of discrimination or "specific, substantial evidence of pretext" in

5  order to create a genuine issue of fact for trial.  Godwin, 150 F.3d at 1220–21.  Bayer's motion for

6  summary judgment on these claims therefore must be granted.

7    B.    Retaliation

8    As evidence that Bayer's proffered reasons for hiring Pinkert are pretext for a retaliatory

9  motive, Hutcherson offers only the timing of the hiring decision and the fact that Hetherington knew

10  that she had filed a complaint against him alleging discrimination.  Evidence based on timing of

11  adverse action may create a triable issue as to retaliatory motive.  Passantino, 212 F.3d at 507.

12  However, the length of time between a discrimination complaint and an adverse employment action

13  should not be considered "without regard to its factual setting."  Coszalter v. City of Salem, 320 F.3d

14  968, 977–78 (9th Cir. 2003).  In the present instance, Hutcherson was denied the promotion less than

15  three months after she filed a discrimination complaint against Hetherington, the person ultimately

16  responsible for making the hiring decision.  Hetherington undoubtedly knew about the complaint, as

17  she filed it in a memo addressed to him.  Hutcherson Dec., Exh. 4.

18    Hutcherson's argument with respect to timing is substantially weakened by the fact that she

19  actively applied for the promotion and filed the internal complaint two months after her application

20  had been submitted.  Unlike a disciplinary action, a change in work duties, or other change in the

21  employee's status quo initiated by the supervisor, Hutcherson herself played a significant role in the

22  timing of the adverse action.  While a lapse of two months between a complaint and an adverse

23  action might provide evidence of retaliation sufficient to withstand summary judgment in some

24  cases, under these circumstances, the timing of the hiring decision alone does not provide significant

25  evidence of retaliatory intent.

26    Other than the timing of the promotion decision relative to her complaint, Hutcherson offers

27  no evidence to suggest that the proffered reasons that the panel selected Pinkert were actually

28  retaliatory.  Hutcherson has introduced no indication that any panel member commented in any way

UNITED STATES DISTRICT COURT
For the Northern District of California

19

UNITED STATES DISTRICT COURT
For the Northern District of California

1    on her previous discrimination complaints.[15]  Indeed, Hutcherson has not provided any evidence that

2    panel members other than Hetherington were even aware of her previous participation in protected

3    activities.  By showing that she "engaged in protected activities, that [her] employer was aware of the

4    protected activities, and that the adverse action followed within a relatively short time thereafter,"

5    Hutcherson has offered no more evidence than necessary to establish her *prima facie* case.  Morgan,

6    88 Cal. App. 4th at 69 (quoting Jones, 669 F. Supp. at 1121).  Hutcherson has failed to carry her

7    burden of producing evidence that Bayer's stated reasons for the hiring are pretextual.  Summary

8    judgment therefore must be granted for Bayer on Hutcherson's retaliation claim.

9    III.    Harassment Claim

10       Hutcherson also alleges that Bayer harassed her on the basis of her race, sex, and age and

11   because of her prior engagement in protected activities by subjecting her to a hostile work

12   environment.  Hutcherson's claim is premised on California Government Code section 12940, which

13   prohibits an employer from harassing an employee on the basis of race, sex or age.[16]  Cal. Govt.

14   Code § 12940(j)(1).  Hostile work environment claims under section 12940 arise "when the

15   workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently

16   severe or pervasive to alter the conditions of the victim's employment and create an abusive working

17   environment." Beyda v. City of Los Angeles, 65 Cal. App. 4th 511, 517 (2d Dist. 1998) (quoting

18   Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).

19       California courts have distinguished between acts by an employer or supervisor which may

20   be actionable under FEHA as harassment and those which may be actionable as discrimination.

21   California regulations governing employment discrimination define harassment as including, but not

22   limited to, verbal epithets or derogatory comments, physical interference with freedom of movement,

23   derogatory posters or cartoons, and unwanted sexual advances.  Cal. Code Regs., tit. 2, § 7287.6.

24   Courts have limited harassment claims to these sorts of interactions that fall outside the scope of

25   workplace duties, while holding that "the exercise of personnel management authority properly

26   delegated by an employer to a supervisory employee might result in discrimination, but not in

27   harassment." Janken v. GM Hughes Electronics, 46 Cal. App. 4th 55, 64 (2d Dist. 1996).  The

28   Janken court set forth the difference between harassment and discrimination at length:

20

> [T]he Legislature intended that commonly necessary personnel management actions such as hiring and firing, job or project assignments, office or work station assignments, promotion or demotion, performance evaluations, the provision of support, the assignment or non-assignment of supervisory functions, deciding who will and who will not attend meetings, deciding who will be laid off, and the like, do not come within the meaning of harassment. These are actions of a type necessary to carry out the duties of business and personnel management. These actions may retrospectively be found discriminatory if based on improper motives, but in that event the remedies provided by the FEHA are those for discrimination, not harassment. Harassment, by contrast, consists of actions outside the scope of job duties which are not of a type necessary to business and personnel management.

Janken v. GM Hughes Electronics, 46 Cal. App. 4th at 64–65.  The California Supreme Court adopted the Janken court's distinction between harassment and discrimination in Reno v. Baird, 18 Cal. 4th 640, 645–47, 657 (1998).[17]

In her complaint, Hutcherson alleges that the following acts by Bayer created a hostile work environment:

(a)    not promoting her to the position of Area Supervisor;
(b)    not setting up special projects for her;
(c)    subjecting her to different work standards than other supervisors; for example, not permitting a supervisor to assist Plaintiff to double check on her paperwork;
(d)    consistently leaving Plaintiff out of the management loop concerning disciplinary matters pertaining to employees she directly supervised;
(e)    forcing Plaintiff to use a chemical storage area downstairs as her office, while Defendant allows other supervisors to work upstairs with computers at their desks;
(f)    failing to discipline employees who engaged in unprofessional work rage directed at Ms. Hutcherson;
(g)    permitting other supervisors to take off work and turn in supervisor's absence reports for themselves; whereas, if Plaintiff is even late turning in her absence slip, Defendant reprimands here with reminder notices;
(h)    giving Plaintiff a Work Plan for Success on the eve of applying for a promotion based upon fabricated information but failing to investigate the source of the information because it might result in a white employee losing his job;
(i)    continuously failing to respond to Plaintiff's application for positions outside of her department; and
(j)    placing Plaintiff in constant fear that she would be terminated.

Compl. ¶ 11.   The vast majority of these acts are of exercises of properly delegated personnel management authority which, under Janken and Reno, are actionable as discrimination but not as harassment. Reno, 18 Cal. 4th at 646–47; see also Strother v. So. Cal. Permanente Medical Group, 79 F.3d 859, 869 (9th Cir. 1996) (change in work duties, exclusion from seminars and management meetings, and denial of secretarial support treated under FEHA as adverse employment actions). They are not, as harassment claims under FEHA must be, "based on a type of conduct that is avoidable and unnecessary to job performance," Reno, 18 Cal. 4th at 646, such as use of slurs or

21

UNITED STATES DISTRICT COURT
For the Northern District of California

1  derogatory drawings, physical interference with freedom of movement, or unwanted sexual

2  advances.  These acts might also be the basis for a constructive termination claim, but Hutcherson

3  has not sought to amend her complaint to include such a theory.

4      The one incident actionable as harassment is the "work rage attack" on Hutcherson by her

5  supervisor, Ron Hein.  According to Hutcherson, Hein came into her office on July 16, 2002, and

6  yelled and cursed at her for several minutes because she missed a scheduled meeting with him to

7  review issues relating to her adherence to a disciplinary program.  Hutcherson Dec. ¶ 44.  Although

8  according to Hutcherson's account Hein's angry reprimand exceeded the scope of his managerial

9  duties and crossed into a type of verbal abuse, Hutcherson does not point to any evidence to suggest

10  that Hein's outburst targeted her on the basis of her race, gender, age, or prior participation in

11  protected activities.  In her declaration, Hutcherson states only that Hein was angry that she missed a

12  meeting.  In fact, Hutcherson has acknowledged that Hein never made any remarks to her or any

13  other employee regarding their age, race, or gender.  Schreibstein Dec., Exh. C, Hutcherson Dep.

14  ("Hutcherson Dep.") at 476:2-5.

15      Hutcherson appears to suggest that Hein must have had improper motivations because her

16  absence from Bayer on the day of the scheduled meeting had been excused by the nurse so that she

17  might attend physical therapy, Hutcherson Dec. ¶ 44, and because the absences from work which had

18  been the subject of the scheduled meeting with Hein turned out to be excused under Bayer medical

19  absence guidelines.  Id. ¶ 46, Hein Dec. ¶ 4 & Exh. B, C.  Neither of these facts suggests a

20  discriminatory motive on the part of Hein, or any motive other than anger that Hutcherson failed to

21  notify him that she would not attend their scheduled meeting.

22      Because Hutcherson has not provided a scintilla of evidence that she was the target of

23  conduct which falls under FEHA's prohibition of harassment on the basis of her race, sex, or age or

24  in retaliation for her prior participation in protected activities, the court grants Bayer's motion for

25  summary judgment on Hutcherson's hostile work environment claim.[18]

26

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1  CONCLUSION

2        For the foregoing reasons, defendant Bayer's motion for summary judgment is GRANTED

3  with respect to plaintiff Hutcherson's claims of discrimination on the basis of race, sex and age, as

4  well as Hutcherson's claims of retaliation and harassment.

5

6  IT IS SO ORDERED.

7

8  Dated:    4/30/03

9                                                            MARILYN HALL PATEL
                                                             Chief Judge
10                                                           United States District Court
                                                             Northern District of California

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23

UNITED STATES DISTRICT COURT
For the Northern District of California

1

### ENDNOTES

2

1.  For convenience, the court refers to Hutcherson's employer as "Bayer" throughout the order.

3

4

2.  Although the joint statement of undisputed facts indicates that Hetherington was promoted in October 1999, JUF ¶ 9, both Hetherington's own declaration and other correspondence in the record indicate that he was promoted August 1999.

5

6

3.  The candidates were Adam Pinkert (white male, age twenty-eight); Russell Mayers (white male, age thirty-two); James Ray (white male, age thirty-nine); Christell Hutcherson (black female, age forty-seven); and Joyce Pearce (black female, age fifty-two).  Candidate Ranking Chart.

7

8

9

10

4.  The four areas of core competency rated by the interview panel included "ability to focus on goals, the ability to collaborate and communicate with others, the capacity for continuously improving work processes, and the ability to lead others to work together." Hetherington Dec. ¶ 4 (numbering omitted).

11

12

5.  Defendants submitted declarations and interview notes from all selection panel members except Holly Butler.

13

14

6.  On the forms used for the interviews, panelists indicated that Hutcherson did not have good technical writing skills, or an understanding of "CSRs" or "validation protocols."  See Area Supervisor Interview Panel Notes.

15

16

7.  While most of the candidates were rated by five assessors, Ray was rated by only four panelists and Mayers was rated by only three.  Candidate Ranking Chart.

17

18

19

8.  Hutcherson argues that the investigation was improper because Ochoco was eventually cleared of attendance violations.  The court fails to see how the resolution of the charge against Ochoco reflects on the propriety of Hutcherson discussing Ochoco's potential suspension with his co-workers or on Bayer's investigation of Ochoco's complaint against her.

20

21

22

9.  As it appears in a photo submitted by Hutcherson, Room 125 houses an office area in one corner, with a desk with a computer and telephone as well as what appear to be filing cabinets.  The remainder of the room contains a row of lockers, a large tool chest, and a number of large plastic and cardboard barrels.  Hutcherson Dec., Exh. 7.

23

24

25

10.  Although Hutcherson claims in her declaration that other shift supervisors did not use the computer in Room 125, she does not set forth any basis of her personal knowledge of the work habits of supervisors on other shifts.

26

27

11.  By contesting only Hutcherson's ability to show pretext for the decision, Bayer does not concede that Hutcherson has satisfied her burden of setting forth a *prima facie* case for purposes other than the present motion.

28

24

12.  Even if Bayer did not generally use interview panels but left leaving hiring decisions to individuals, the use of a panel in any given instance would provide greater protection against discrimination than the supposedly ordinary process of hiring by a single manager.  The court questions the soundness of Hutcherson's argument that any deviation from procedure—even one that enhances protections against discrimination—provides evidence of discrimination.

13.  Bayer points out that Russey had over fifteen years of experience at the time of his promotion, Russey Dec. ¶ 1.  Bayer does not, however, offer any testimony indicating that this experience would in fact be considered equivalent to the requirements set forth by the job posting.

14.  At oral argument, Hutcherson's counsel clearly limited her claim of discrimination to the promotion to Area Supervisor, stating that the facts surrounding other promotions provided evidence of discrimination but were not separate claims.  Although Bayer addressed five unsuccessful promotion attempts that Hutcherson had listed in her responses to interrogatories, Hutcherson in her opposition to summary judgment refers only to her applications for promotion to Regulatory Affairs Administrator and Supervisor Distribution and Warehouse.

15.  Hutcherson does point to evidence that after Pinkert was promoted, he heard a "generalized rumor" from Russey, among others, that Hutcherson received her 1997 promotion as the result of her prior lawsuits.  Pinkert Dep. 120:21–121:16.  There is no evidence to suggest that Hetherington or any other Bayer employees involved with the Area Supervisor hiring had heard or spread this rumor.

16.  Although the Ninth Circuit has recognized that harassment in retaliation for an employee's prior protected activity may form the basis for a Title VII claim in Ray v. Henderson, 217 F.3d 1234, 1245 (9th Cir. 2000), Hutcherson does not point to any California court that has recognized retaliation-based harassment under FEHA.  Because Hutcherson does not offer evidence of any conduct on the part of Bayer that could constitute retaliatory harassment, the court need not decide whether such conduct would be actionable under FEHA.

17.  Both the Janken and Reno courts faced the issue of whether a plaintiff claiming employment discrimination could hold their supervisor individually liable for imposing adverse employment actions.  The Reno court began by noting that FEHA places liability on individual workers or supervisors for harassment by prohibiting "an employer . . . or any other person" from harassing an employee, while prohibiting only "an employer" from engaging in improper discrimination.  Reno, 18 Cal. 4th at 644–45; Cal. Govt. Code. § 12940(a), (h)(1).  The distinction between discrimination and harassment was essential to defendant's individual liability, and the court sees no basis for distinguishing the present case from the analysis set forth by the Reno and Janken courts.

18.  While the incidents Hutcherson cites in her hostile work environment claim might have been addressed as discrimination claims, Hutcherson's attorney at oral argument insisted—in the face of questioning by the court—that she sought relief based exclusively on a theory of harassment and not on a theory of discrimination.  This court cannot fairly construe Hutcherson's complaint as presenting discrimination claims while remaining consistent with her own unqualified characterization of her claim as one of harassment.

25

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


CHRISTELL HUTCHERSON,

              Plaintiff,

   v.

BAYER CORPORATION,

              Defendant.

_____/

Case Number: CV01-01799 MHP

**CERTIFICATE OF SERVICE**


I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on May 1, 2003, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.


Jerry Schreibstein
Kelly Herlihy & Klein LLP
44 Montgomery Street
Suite 2500
San Francisco, CA 94104

Linda J. Gulledge
Orrick Herrington & Sutcliffe LLP
400 Capitol Mall, Suite 3000
Sacramento, CA 95814

Howard Moore
Moore and Moore
445 Bellevue
Second floor
Oakland, CA 94610

Mellanese S. Lofton
836B, Southhampton Road
Suite 360
Benicia, CA 94510

Jeffrey D. Wohl
Paul, Hastings, Janofsky & Walker LLP
55 Second Street
San Francisco, CA 94105-3441

Richard W. Wieking, Clerk

BY: _____
      Deputy Clerk